[L.A. No. 32090. Apr. 24, 1986.]

MARTIN C. CALAWAY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

744

**COUNSEL**

Robert M. Newell and Newell & Chester for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Richard J. Zanassi, Arthur Margolis and Caryn Espo for Respondent.

OPINION

THE COURT.*—This is a proceeding to review an order of the Review Department of the State Bar Court declining to reinstate petitioner in the practice of law.

Petitioner was admitted to practice in 1956. In 1974, he was convicted in United States District Court of violating 18 United States Code section 1955 (participating in the financing of an illegal gambling business) and 18 United States Code section 371 (conspiracy to violate § 1955). (*United States* v. *Calaway* (9th Cir. 1975) 524 F.2d 609, cert. den. (1976) 424 U.S. 967 [47 L.Ed.2d 733, 96 S.Ct. 1462].) The matter was referred to the State Bar for a determination whether the circumstances surrounding the conviction involved moral turpitude or other misconduct warranting discipline. (See Bus. & Prof. Code, §§ 6101, 6102; Cal. Rules of Court, rule 951(c) & (d).)

Following a hearing, a local bar administrative committee found that the offenses involved "conscious and willful acts of moral turpitude" on petitioner's part and recommended disbarment. The recommendation was approved by the State Bar disciplinary board. In 1977, this court agreed that the acts involved moral turpitude and that disbarment was the appropriate sanction. (*In re Calaway* (1977) 20 Cal.3d 165 [141 Cal.Rptr. 805, 570 P.2d 1223].)

Petitioner filed an application for reinstatement in November of 1983. (Rules Proc. of State Bar, rule 660 (hereafter rule 660).) Following hearings held in August and October 1984, the hearing panel issued written findings and recommended reinstatement. The review department of the State Bar found, however, that petitioner had failed to sustain his burden of demonstrating fitness to resume practicing.[1] The review department denied reinstatement, and this proceeding followed.

The burden of proving rehabilitation rests with the attorney seeking reinstatement (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 546 [248 P.2d 3]), and that burden is heavy. The person seeking reinstatement after dis-

---

*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Panelli, J.

[1]The review department found that (1) petitioner continues to fail to appreciate the nature and gravity of the conduct for which he was disbarred; (2) the petition for reinstatement contained false information on a material matter concerning whether he had been charged with fraud and whether he had failed to disclose a finding against him in a proceeding related to Yale v. Calaway, an action which was instituted in United States District Court after the disbarment proceedings; and (3) petitioner's character witnesses failed to demonstrate any relevant knowledge of any purported rehabilitation. In addition, the review department believed petitioner failed to "satisfactorily demonstrate his present learning and ability in the law . . . ."

barment is required to adduce stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, although an application for reinstatement is treated by this court as a proceeding for admission, the proof presented must be sufficient to overcome our prior adverse judgment of the applicant's character. (*Tardiff* v. *State Bar* (1980) 27 Cal.3d 395, 403 [165 Cal.Rptr. 829, 612 P.2d 919].)

Since his disbarment, petitioner has been supporting himself with income from Calaway Enterprises, a company he formed for the purpose of handling real estate and stock market investments. He has acquired, refurbished and sold several properties. He has also continued his work with the Vikings, a charitable organization of some 200 members who raise money for neglected and disabled children. He has been a member for several years, and of late has served on the steering committee, working actively on several projects that benefit disadvantaged children in the community.

Despite this respectable record, the State Bar insists petitioner has not carried his burden of showing by clear and convincing evidence that he is presently fit to practice law. This conclusion is based on the fact that his petition for reinstatement omitted certain information about a third party action in a civil lawsuit. Some background regarding that action is necessary to place this purported omission in context.

In December 1977, relying on evidence adduced at the disbarment proceedings, Yale University brought an action in federal court for damages and injunctive relief against petitioner and others, claiming that petitioner had fraudulently induced the conservatee for whom he had served as conservator to execute a new will in favor of one Jean Rinaldi and to remove Yale University as the beneficiary of the estate.

Two days after the complaint was filed, petitioner notified his malpractice insurance carriers of the pendency of the action. The carriers declined coverage. Petitioner then brought a third party action against the carriers, seeking to have them represent him in the Yale lawsuit. The matter was ultimately resolved favorably to the carriers on summary judgment. In ordering that judgment, the district court found that malpractice insurance policies issued in 1975, 1976 and 1977 had been rescinded *ab initio* as a result of petitioner's concealment of material facts in his insurance applications. Specifically, the court found that petitioner had omitted from his applications any mention of an alleged misappropriation of funds from the conservatorship estate, his involvement in financing the gambling operation, and his federal conviction. The court also found that the applications contained no reference to the State Bar recommendation that he be disbarred.

Despite the foregoing, after the third party claim was dismissed and the underlying action proceeded to trial, a jury found for all defendants—including petitioner—on all causes of action.

In his petition for reinstatement, petitioner reported the Yale lawsuit and the fact that a jury had found for the defendants. The third party proceeding, however, was not included in the requested list of cases in which he had been involved since disbarment.

Reduced to essentials, the State Bar offers two reasons to justify rejection of the present petition: first, petitioner has not shown adequate contrition for the conduct that originally caused his disbarment, and second, he omitted details of ancillary judicial proceedings from his application for reinstatement. Neither point withstands objective scrutiny.

■ On the first point, the record suggests that the bar expected petitioner to beat his breast and loudly proclaim *mea culpa* for a dissolute past. As one member of the review panel declared during the hearing, "somewhere along the line I think the man has to belly-up to the Bar and say, 'I did wrong. I am sorry for it,' and then come in a bit repentant . . . ." And later he told petitioner's counsel: "It appears that your client is not the repentant type of individual that we would want to consider for reinstatement."

Justice Tobriner's opinion for this court in *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 744-745 [159 Cal.Rptr. 848, 602 P.2d 768], provides the appropriate response to the foregoing demand: a petitioner's "consistent refusal to retract his claims of innocence and make a showing of repentance appears to reinforce rather than undercut his showing of good character. Precisely because the Committee made clear that [petitioner's] chances for admission would be improved if he demonstrated remorse, we find his refusal to do so indicative of good character rather than the contrary: [he] refused, in effect, to become the fraudulent penitent for his own advantage.

"An individual's courageous adherence to his beliefs, in the face of a judicial or quasi-judicial decision attacking their soundness, may prove his fitness to practice law rather than the contrary. We therefore question the wisdom of denying an applicant admission to the bar if that denial rests on the applicant's choosing to assert his innocence regarding prior charges rather than to acquiesce in a pragmatic confession of guilt, and conclude that [petitioner] should not be denied the opportunity to practice law because he is unwilling to perform an artificial act of contrition. [Fn. omitted.]" (Accord, *Hightower v. State Bar* (1983) 34 Cal.3d 150, 157 [193 Cal.Rptr.

153, 666 P.2d 10]; *Martin B.* v. *Committee of Bar Examiners* (1983) 33 Cal.3d 717, 725-726 [190 Cal.Rptr. 610, 661 P.2d 160].)

Justice Carter, in his caustic prose, put the matter succinctly in his dissenting opinion in *Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 555 [248 P.2d 3]: "The basis of the majority opinion seems to be that petitioner has not made a lachrymose display of penitence, or come to the Throne of Grace humbly begging forgiveness for sins he claims not to have committed. Not only that, but he must apparently produce witnesses who have heard him shout from the roof tops that he was a sinner but has forsaken his sins and is now redeemed. The majority seems to have forgotten that deeds speak louder than selfserving protestations. By the record petitioner has conclusively demonstrated that his conduct since disbarment has established rehabilitation. Nothing more should be required . . . ."

We do not believe petitioner's original offense was so horrendous as to merit a permanent mark of Cain. Understandably he sought to minimize the seriousness of the offense of which he had been convicted. In doing so he made two convincing points: first, no client had ever been damaged by his past conduct; and second, the federal judge who presided over his trial originally sentenced him to four years in prison, but later reduced that sentence to three years' probation and then terminated probation after two years. These facts strongly suggest that the judge who heard the evidence did not regard the conduct as heinous as does the State Bar.

■    Second, the bar maintains that petitioner's plea for reinstatement "contained false information." That is a patent exaggeration. At worst, it might be contended that petitioner could have been more explicit in his submission.

Petitioner did report the proceedings in the civil case brought by Yale. The allegations of omissions in applications for insurance were made by a carrier in ancillary proceedings. While petitioner did not provide details of the latter proceedings, his assumption was not unreasonable that the bar would review the entire file if it believed the matter significant.

The hearing panel made a specific finding on that subject: "5. While the questionable information submitted with Petitioner's action could have been more detailed, it is apparent that there was no intent to mislead the State Bar or to conceal derogatory information." Since the hearing panel heard the witnesses and reviewed the file and other evidence, its finding should be persuasive. We find it so.

The hearing panel also received testimony from seven witnesses and written character references from twelve persons, accounting for substantially

all of petitioner's time and activities since his disbarment. From this evidence the panel concluded "there was absolutely no evidence, direct or indirect, circumstantial or by hearsay, showing any act or acts of misconduct or association with questionable citizens."

In sum, we agree with the conclusions of the hearing panel, which were:

"1. While the Petitioner has previously proceeded in an ill-advised fashion in areas of tactics in the handling of his legal and personal affairs, the practices have been discontinued and he has led an exemplary life since his disbarment and no longer associates with questionable citizens.

"2. Petitioner has demonstrated significant and substantial change since his disbarment, sufficient to meet his burden of proving rehabilitation;

"3. Petitioner has met the burden of proving that he is morally fit to practice law in the State of California;

"4. Petitioner has met the burden of proving with reasonable certainty that he will not commit acts of moral turpitude if admitted to practice law.

"5. Petitioner has established present ability and learning in the general law;

"6. Petitioner has established his rehabilitation and personal moral fitness for reinstatement."

The petition is granted. It is ordered that petitioner be reinstated on the roll of attorneys at law in this state on payment of the fees and taking the oath required by law.

**BIRD, C. J.**—I respectfully dissent.

My colleagues dismiss, in a few short sentences, the significance of petitioner's failure to mention in his application for reinstatement the highly unfavorable finding of fraud the federal district court made in the third party insurance proceeding in Yale v. Calaway. When that finding is examined in conjunction with the other evidence presented at the hearing, the conclusion is inescapable that petitioner has not discharged his heavy burden of demonstrating present fitness to practice law and character worthy of readmission that our cases require. For this reason, I cannot concur in the decision to grant the petition for reinstatement.

## I.

A bit of background is necessary to place the present proceedings in perspective. Following his 1974 convictions in district court of violating 18 United States Code section 1955 (conducting, financing, managing, supervising, directing, or owning an illegal gambling business) and 18 United States Code section 371 (conspiracy to violate § 1955), petitioner was disbarred by a unanimous vote of this court. (*In re Calaway* (1977) 20 Cal.3d 165 [141 Cal.Rptr. 805, 570 P.2d 1223].) The facts giving rise to the criminal convictions are recounted in this court's opinion as follows:

"[P]etitioner and his coconspirators were involved with an unlawful gambling operation in the San Fernando Valley. . . . Petitioner participated in the preliminary discussions between the coconspirators which ultimately led to the formation of the unlawful gambling operation. Among other things, the parties discussed during these meetings the financial contributions which each would make, and their respective shares of the proceeds. Petitioner was to contribute $20,000 as his share, consisting of $10,000 in cash and $10,000 in legal services; in return for his contribution, petitioner would receive from 20 to 25 percent of the 'take.'

"Petitioner, with knowledge of coconspirator John Vaccaro's status as a professional gambler and his intent to set up an unlawful gambling operation, loaned $7,500 to him, at least $2,500 of which was actually used to fund the game. Petitioner ultimately invested $5,000 and received in return some of the proceeds from the illegal gambling. Petitioner gave nonlegal advice to the coconspirators regarding the practical aspects of their illicit endeavors, including the obtaining of gambling equipment, chips, and customers to frequent the new establishment, and the purchase of 'sanction' or protection from the police. Petitioner also gave legal advice to the coconspirators regarding the illegal nature of the proposed operation and the necessity of concealing its activities.

"The dice and card games operated by petitioner's coconspirators were 'rigged' to cheat the customers and increase 'house' profits. From petitioner's close association with coconspirator Vaccaro, and his financial interest in the operation, it may reasonably be inferred that petitioner was aware that such cheating of customers occurred.

"In addition to the foregoing, the record indicates that the $7,500 loan from petitioner to Vaccaro came from funds held by petitioner as conservator of the estate of an 86-year-old incompetent; that these funds were disbursed without the knowledge or approval either of the conservatee or of the court with jurisdiction over his [*sic*] affairs, that the loan was not dis-

closed by petitioner's subsequent accountings; and that the loan was not fully repaid until after the federal prosecution had commenced." (*In re Calaway, supra,* 20 Cal.3d at pp. 168-169.)

Petitioner's reinstatement petition came before the hearing panel in August and October of 1984. That panel recommended reinstatement. The State Bar sought review of that recommendation and in May of 1985, the review department, by an eight-to-one vote, denied reinstatement. This proceeding followed.

## II.

The burden of proving rehabilitation rests with the attorney seeking reinstatement. (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 546 [248 P.2d 3].) That burden is a heavy one. (*Ibid.*) As this court has observed, "'"[t]he person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character." [Citations.] In determining whether that burden has been met, the evidence of present character must be considered in the light of the moral shortcomings which resulted in the imposition of discipline.' [Citation.]" (*Tardiff* v. *State Bar* (1980) 27 Cal.3d 395, 403 [165 Cal.Rptr. 829, 612 P.2d 919].)

Despite the respectable record that petitioner has amassed in his investment firm and in his work with the Vikings (see maj. opn., *ante,* at p. 746), petitioner's omission of highly unfavorable and material information from his petition for reinstatement convinces me that he has failed to meet his burden of showing that he is presently fit to practice law.[1]

As the majority explain, shortly after Yale University filed the action against petitioner, he filed a third party action against his malpractice carrier to force it to defend him in that action. The carrier had declined coverage

---

[1]Since I believe reinstatement should be denied on the basis of the omission alone, there is no need to reach the question of whether an applicant for reinst~* . ~~~~ ~ ~~st acknowledge misconduct for which he has already been punished by *.~ criminal justice ~ ~tem and disciplined by the State Bar and by this court. (See maj. opn., *ante,* at pp. 747-748); cf. *Martin B.* v. *Committee of Bar Examiners* (1983) 33 Cal.3d 717 [190 Cal.Rptr. 610, 661 P.2d 160]; *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 745 [159 Cal.Rptr. 848, 602 P.2d 768].)

due to petitioner's earlier misrepresentations in his malpractice insurance applications, and eventually prevailed in the third party action. In its order granting summary judgment for the carrier, the district court found that petitioner had omitted from his applications any mention of (1) the misappropriation of funds from the conservatorship estate (which occurred in 1971); (2) his involvement in the illegal gambling operation or any details about that operation; and (3) his 1974 federal conviction and sentence. The court also found that the 1976 and 1977 insurance applications failed to contain any reference to (1) this court's 1975 order referring the conviction to the State Bar for possible discipline; (2) the fact that the State Bar had filed a complaint against petitioner; and (3) the fact that the State Bar had, in March of 1977, recommended that he be disbarred.

In his petition for reinstatement in 1983, petitioner reported the Yale lawsuit as well as the fact that a jury had found for all defendants. He stated that "[t]he *only* charge of fraud made against the Petitioner subsequent to his disbarment was that advanced in the case of *Yale v. Calaway, et al,* . . . . [¶] The jury ruled in favor of Petitioner in that action." (First italics added.) Although the petition was signed by his attorney, petitioner verified its contents, as the State Bar procedural rules on reinstatement require.

The petition contained no other information about any other charges of fraud. Although petitioner had been a party in the third party action,[2] that action was nowhere cited in the list of litigation which he had been involved in as a party since disbarment. It was this omission that the review department relied on in denying reinstatement.

That reliance was entirely appropriate. In his petition, Calaway purported to list—as he was required to—not only all litigation in which he had been a party but also any charges or claims of fraud or misrepresentation made against him. (See fn. 2, *ante.*) He listed only information about the primary

---

[2]Rule 660 of the State Bar procedural rules requires that a petition for reinstatement contain "the information and agreement prescribed by the State Bar." The bar typically sends an informational circular to individuals who are contemplating filing a petition. That circular specifies what information must be included in a petition, and requires, inter alia, "a statement showing the *dates, general nature and final disposition* of every civil action wherein petitioner was either a party, *plaintiff* or defendant," as well as "a statement as to whether or not any charges of fraud were *made, or claimed, against petitioner*" during the period between the date of disbarment and the date of the filing of the petition. (Italics added.)

At oral argument, petitioner's counsel acknowledged that he had received a copy of the circular before preparing the petition. Indeed, the petition for reinstatement purports to comply with the circular in that it follows a format which responds to the information it requires.

Yale lawsuit, thereby creating the erroneous impression that the only charge of fraud made since 1977 had been resolved favorably to him.[3]

Petitioner's counsel has two responses. First, he argues that petitioner had no intention to mislead the State Bar, since "[i]t would be expected that the State Bar would examine [the] file [in Yale v. Calaway] in the course of its investigation of the matter." Presumably, petitioner believed that since the third party matter bore the same case number as the underlying action, furnishing the State Bar with the correct case number and pointing it in the right direction constituted sufficient disclosure.

This argument—which my colleagues surprisingly adopt (maj. opn., *ante,* at p. 748)—misperceives the burden of proof in a reinstatement proceeding. It is not the State Bar's responsibility to ferret out inconsistencies or omissions in an applicant's petition. Rather, it is the petitioner's burden to demonstrate by clear and convincing evidence that he or she is a suitable candidate for readmission to practice.

Petitioner was required to disclose every civil action which he had been involved in as a party as well as every charge of fraud made or claimed since disbarment. He omitted unfavorable information and included only the favorable, thereby gambling on the chance that the State Bar's investigatory procedures would not uncover the whole story. Such lack of candor falls short of the " " " "stronger proof of . . . present honesty and integrity than one seeking admission for the first time" " " " (*Tardiff* v. *State Bar, supra,* 27 Cal.3d at p. 403) must present in order to gain reinstatement.

The omission also demonstrates a repetition in conduct that is antithetical to good moral character. When petitioner asked his insurance carrier in 1977 and 1978 to cover him in the *Yale* v. *Calaway* matter, he was apparently hoping either that the carrier would not discover that he had provided false information on his 1975, 1976 and 1977 insurance applications, or that having discovered such conduct, it would provide coverage anyway. In 1983, when petitioner signed the petition for reinstatement, he was appar-

---

[3]Another aspect of the petition, also relating to Yale v. Calaway, is troubling. Accompanying petitioner's statement that the only charge of fraud was that made in the Yale lawsuit was the additional statement that in a special interrogatory and on the verdict form, "the answers of the jury were in favor of your Petitioner." Petitioner attached copies of the verdict form and 10 special interrogatories to the petition. However, he neglected to note that the nine special interrogatories which exonerated petitioner of any wrongdoing had been stricken by the district court on the basis that the jury had not been polled on them, as Yale's counsel had requested.

Since the jury *did* find for petitioner on the fraud claim, however, this omission was far less significant than the third party insurance matter. However, petitioner should have paid closer attention to this important detail, given the high burden he had in demonstrating good character before the State Bar.

ently hoping either that the bar would not discover the unfavorable third party action, or that having discovered it, the bar would not deem that action significant enough to deny reinstatement. Such a cavalier attitude on the part of a would-be attorney who is to be entrusted with handling legal affairs of clients should not be sanctioned.

Petitioner's counsel's second response to the omission is even less convincing. He claims that any deficiencies in the petition "are solely the fault of petitioner's counsel who prepared the Petition. They should not be attributed to Petitioner."[4]

This argument might have some colorable merit if petitioner were untutored in the law and had no knowledge of his attorney's actions. However, petitioner *signed* the petition and verified its contents as required by rule 660. Whatever the gaps in his attorney's knowledge, *petitioner* was unquestionably aware that a charge of fraud had been claimed and sustained against him in the third party matter.

If petitioner were seriously concerned with presenting a picture of rehabilitation to the State Bar, he undoubtedly would have been sensitive to the need for a full disclosure of any information which bore on the reinstatement question, and would have brought the omission to his counsel's attention before verifying the accuracy of the petition. While it might be improper to penalize a *layperson* for failing to correct mistakes his attorney makes in pursuing his interests, such reasoning carries little weight when the client has more than 20 years of experience as an attorney, personally verifies allegations his attorney makes in a pleading, and himself is seeking to practice law—hopefully without making similar mistakes.

The remaining evidence petitioner presented at the hearing does not undermine the conclusion that petitioner is not a fit candidate for readmission to the bar. For example, although several individuals came forward on petitioner's behalf, none of the evidence they furnished overcame the highly negative inference created by petitioner's omission in his reinstatement petition.

Five character witnesses testified before the hearing panel on petitioner's behalf. One, an attorney for 31 years and a fellow Viking, had testified as a character witness in the federal court proceedings. He stated that he had

---

[4]Counsel took the same position in the proceedings below, maintaining that "Anything wrong with the Petition for Reinstatement is my responsibility, not Mr. Calaway's. I prepared it. He should not be charged with anything that is in that." Counsel reiterated that stance at oral argument, insisting that since he did not know about the third party action when he prepared the petition, the omission was *his* fault and not his client's.

known petitioner for 30 years, that petitioner had an impeccable reputation for truth, honesty, and integrity, and that petitioner had admitted exercising "extremely bad judgment" in the events leading to his disbarment. This witness knew nothing, however, about the loan from the conservatorship estate or the proceedings in Yale v. Calaway.

Another attorney who knew petitioner for two years was aware of the disbarment but knew only that petitioner had "been involved" in some federal court proceedings. He was never told the specifics of the offenses, and it was his impression that the conviction had been based on circumstantial evidence and that petitioner still believed that he was innocent.

Three other witnesses, clients and friends of petitioner of long standing, also testified. None knew the details of the federal court proceedings. All held petitioner in high esteem. One of these witnesses testified that he was "proud of his association" with petitioner and of the way he had acted since the disbarment. He stated that petitioner's reaction to the disbarment was not to let it "get him 'down,' but [to go] on to other productive things."

The State Bar countered these witnesses with the testimony of John Kelly, a member of the Vikings who had known petitioner for 25 years. Kelly had lost money in an investment which had been managed by petitioner and had a very low opinion of petitioner's honesty and integrity. That opinion was based on petitioner's offer to help him out of a business problem. Petitioner allegedly offered to put Kelly in touch with people who would, for the right price, "take care of the problem" by injuring the persons who were threatening him. This incident allegedly occurred before the 1977 disbarment. As such, it was of minimal relevance to the question of reinstatement.

The twelve letters petitioner submitted at the hearing—from one superior court judge, two attorneys, business acquaintances, former clients and friends—all attested to petitioner's honesty and integrity. One letter indicated that petitioner never expressed any resentment about the disbarment or conviction, but instead "resolved to enhance and enrich his life," becoming active in stock market investments and real estate. Another letter, from the president of a corporation with which petitioner had had business dealings, stated that petitioner's position as an officer in the corporation evidenced "our constant recognition of his honesty, intelligence, and expertise."

"Letters of recommendation and the favorable testimony of witnesses, especially that of employers and attorneys, are entitled to considerable weight. [Citations.] But such evidence, however laudatory or great in quantity, is not alone conclusive. [Citations.]" (*Feinstein* v. *State Bar, supra,*

39 Cal.2d at p. 547.) Though this evidence was highly complimentary, it failed to overcome the strong negative impression left by petitioner's omission of highly material but unfavorable information in his reinstatement petition.

It is true that petitioner demonstrated present learning and ability in the law, notwithstanding the review department's contrary finding. For example, one of petitioner's attorney acquaintances had consulted petitioner in matters arising in his practice. The superior court judge indicated that petitioner's "interest in the field of law ha[d] never waned and in my conversations with him, he still exhibits a superior knowledge of current law that is impressive." Another attorney wrote that petitioner maintained a "dedicated interest in the law and the study thereof . . . ." Finally, petitioner's former office mate wrote that petitioner frequently spent time in his office library, reading and acquainting himself with the current trends in the law and discussing cases with attorneys in the office.

Although this court has never specified exactly how much current knowledge of the law is required for reinstatement, conduct comparable to petitioner's has been noted in at least two cases in which reinstatement was permitted. (*Allen* v. *State Bar* (1962) 58 Cal.2d 912, 914 [26 Cal.Rptr. 771, 376 P.2d 835]; *Werner* v. *State Bar* (1954) 42 Cal.2d 187, 190 [265 P.2d 912].) However, in other cases, such conduct has not warranted reinstatement when considered in conjunction with the reasons for the disbarment and other factors (*Roth* v. *State Bar* (1953) 40 Cal.2d 307, 310-314 [253 P.2d 969]; *Feinstein* v. *State Bar, supra,* 39 Cal.2d at pp. 545, 548), even when such conduct has been accompanied by recent passage of the Professional Responsibility Examination (*Tardiff* v. *State Bar, supra,* 27 Cal.3d at p. 399).

While it is commendable that petitioner has kept himself well-informed of legal developments in areas of interest to him, such learning is of marginal significance when compared to the material omissions in his petition. For this reason, the fact that petitioner has kept current, even considered in conjunction with the favorable character evidence, does not demonstrate sufficient "sustained exemplary conduct" (*In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191]) to warrant reinstatement.

III.

The evidence presented at the hearing failed to indicate by clear and convincing proof that petitioner possesses the qualities required to be readmitted to practice. Although petitioner has amassed a respectable track record since his disbarment in terms of using his abilities to advance both himself

and those around him, he was far less than candid and forthright in his petition and in the hearings about events that relate directly to the issue of fitness to practice. (Cf. *Roth* v. *State Bar, supra,* 40 Cal.2d at p. 314.) Since such omissions go to the heart of the rehabilitation question, I cannot join in my colleagues' decision that the review department inappropriately relied on that factor in denying reinstatement. Since nothing else in the record suggests that petitioner is presently fit to practice law, I would uphold the review department's decision and deny reinstatement.

Reynoso, J., concurred.