[No. S006262. Nov. 16, 1989.]

In re ALFREDO G. RIVAS on Disbarment.

**COUNSEL**

Roger R. Remlinger and Dean R. Pic'l for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

## OPINION

**THE COURT.**\*—We review the State Bar Court's recommendation that petitioner Alfredo G. Rivas be disbarred following his five felony convictions under the Elections Code. (§§ 29200, subd. (a) [unlawful voter registration], 29303 [false nomination paper or declaration of candidacy].) The crimes occurred when petitioner knowingly provided the registrar of voters with false residency information during his attempt to qualify as a candidate for judge of the San Bernardino County Municipal Court, Chino Division, in a 1982 election.[1]

After receiving the record of conviction and determining that the offenses involved moral turpitude, we ordered that petitioner be suspended from the practice of law effective January 11, 1985, pending further order of this court. We also referred the matter to the State Bar for a determination of the appropriate discipline. The hearing panel recommended that petitioner be suspended from the practice of law for one year, prospective to the interim suspension. The review department adopted its own set of factual findings and, by a vote of seven to four, increased the proposed discipline to disbarment.

On three separate occasions over a one-month period, petitioner filed five official documents containing information he knew was false. Because these acts involved criminal deceit, moral turpitude, and public harm, disbarment can be averted "[o]nly if the most compelling mitigating circumstances clearly predominate . . . ." ■ ■■■■ (See Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 3.2.)[2] However, other than his lack of prior discipline since admission to the bar in 1972, petitioner offers little evidence to explain or mitigate his misconduct. And, while he has admitted facts which, for the most part, establish his guilt of the criminal charges, he has no apparent understanding of the wrongfulness of his conduct. Since we have no basis for concluding that petitioner would not commit similar misdeeds in the future, we adopt the recommended discipline.

---

\* Before Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Low (Harry W.), J.†

†Presiding Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

[1] Petitioner's name appeared on the ballot, but he did not win the election.

[2] The Standards for Attorney Sanctions for Professional Misconduct (Standards) guide our choice of the appropriate discipline where, as here, the hearing panel decision is filed after January 1, 1986. (*Kent* v. *State Bar* (1987) 43 Cal.3d 729, 737 [239 Cal.Rptr. 77, 739 P.2d 1244].)

All further references to cited standards are to this source.

## Background

Petitioner admitted at both his criminal trial and disciplinary hearing that he signed and filed the pertinent documents with the registrar of voters in 1982. The first two documents (voter registration affidavit and declaration of intent to run for office) were dated February 10, and listed petitioner's residential address as 4365 Mt. Vernon Avenue, Chino (Mt. Vernon address). A week later, on February 17, he filed two more documents (declaration of candidacy and appointment of circulators) reflecting the same address. On March 12, petitioner filed a second voter registration affidavit, changing his home address to 4315 Valle Vista Drive, Chino (Valle Vista address).[3] Petitioner also admitted that he has always known these documents called for the place he currently, *actually* lived (not where he intended to live in the *future*). He also knew that a Chino residence was necessary to qualify as a candidate for municipal court judgeship in that district.

In June 1983, petitioner was charged with two felony counts of violating Elections Code section 29200, subdivision (a), by "wilfully registering" on February 10 and March 12, 1982, as a voter residing at the Mt. Vernon and Valle Vista addresses, "knowing such registration was unlawful."[4] The information also charged petitioner with three felony counts of violating Elections Code section 29303, by "knowingly" filing "false" election documents on February 10 and 17, 1982, "falsely listing" the Mt. Vernon address as his residence.[5]

At petitioner's criminal trial in late 1983, the chief clerk of the San Bernardino County Registrar of Voters office testified that petitioner qualified as a candidate in 1982 for the office of municipal court judge in Chino, because all five documents indicated that petitioner *actually* lived in that district at the time they were filed.

Petitioner testified at trial that, when he filed the first four documents in February 1982, he "did *not actually live*" at the Mt. Vernon address but at

---

[3] The election papers were admitted as exhibits in petitioner's criminal trial. However, only the reporter's transcript from that trial—not the exhibits—is included in our record.

[4] Elections Code section 29200, subdivision (a), states: "Every person who willfully causes, procures, or allows himself or any other person to be registered as a voter, knowing that he or that other person is not entitled to registration, is punishable by imprisonment in the state prison for 16 months or two or three years, or in a county jail for not more than one year."

[5] Elections Code section 29303 provides: "Any person who files or submits for filing a nomination paper or declaration of candidacy knowing that it or any part of it has been made falsely is punishable by a fine not exceeding one thousand dollars ($1,000) or by imprisonment in the state prison for 16 months or two or three years or by both such fine and imprisonment."

an Upland address which he knew was "outside" the Chino municipal court district. (Italics added.) Petitioner explained that he *"intended"* to ultimately exchange his Upland home for the Mt. Vernon home belonging to his wife's niece. (Italics added.) He testified that he and his wife did not learn until after February 17, 1982, that no exchange would occur. The niece and her husband testified to the contrary, indicating that they told petitioner's wife as early as January 1982 that they would not move.

Petitioner further testified at trial that he "panicked" when he learned that no exchange with the niece would occur. He therefore asked his sister-in-law if he could rent her Valle Vista home. Petitioner claimed that, by the time he reregistered as a voter at the Valle Vista address on March 12, 1982, he had already moved some furniture and personal belongings into the house. According to petitioner, he lived there for one month.

However, the previous tenant at the Valle Vista house testified at trial that his lease was paid through March 21, 1982. Although the tenant stated that he had moved from the premises by the end of February 1982, he returned a few times through March 14, to do some cleaning. At no time, he testified, did he see any furniture, appliances, or other items indicating that someone else had moved in.

Petitioner's sister-in-law confirmed at trial that the prior tenant's lease did not expire until March 21. The sister-in-law also testified that she did not execute a lease with petitioner until March 15, and that he moved onto the premises *after* that date.

Several witnesses, including judges,[6] lawyers, and a clergyman, testified at petitioner's criminal trial regarding his reputation for truth and integrity.

The jury found petitioner guilty as charged. In March 1984, imposition of sentence was suspended, and petitioner was placed on two years' probation on various conditions, including two hundred hours of community service and payment of a $2,500 fine. Petitioner appealed, and his convictions were ultimately affirmed in a decision which became final in April 1986.

Meanwhile, this court ordered that petitioner, having been convicted of offenses involving moral turpitude, be suspended from the practice of law effective January 11, 1985, pending further order of this court. In September 1985, the superior court reduced petitioner's felony convictions to misdemeanors. We subsequently referred this matter to the State Bar for a hearing and disciplinary recommendation.

---

[6] We note that canon 2B of the California Code of Judicial Conduct, effective January 1, 1975, states in pertinent part: "Judges should not testify voluntarily as character witnesses."

At the State Bar hearing in February and April 1987, petitioner essentially sought to relitigate the question of his criminal wrongdoing. He again conceded that he never actually lived at the Mt. Vernon address but that he merely intended to do so at some point in the future. He testified that it was on the evening of February 10—not after February 17 as he had stated at trial—that he and his wife learned that the niece would not exchange homes.

Petitioner's State Bar testimony regarding the Valle Vista address was internally contradictory. At one point, he claimed to have moved into that address *before* March 12, when the second voter registration form was filed. However, he also testified that the lease was signed on March 14, and that he moved into the Valle Vista house shortly *after* its execution.

Petitioner further testified at the disciplinary hearing that he felt "remorseful over what [had] happened." He was adamant, however, that he never knowingly filed any unlawful or false documents. Petitioner also testified that he had performed 50 more community service hours than were required under the terms of his probation, and that he had done some construction work following this court's interim suspension order.

The only other evidence offered on petitioner's behalf at the hearing was by an attorney who testified as follows: Although they were never "close," the witness had been professionally "acquainted" with petitioner since 1979. Before petitioner was criminally convicted, he enjoyed a reputation for truth and veracity in the legal community. Even after judges and lawyers had learned about petitioner's conviction, his reputation remained unchanged. The witness believes petitioner is "utterly competent" to practice law, and is "one of the finest people I know and one of the most upright and ethical persons I could hope to deal with in a courtroom." However, the witness personally knows of no circumstances "mitigating" petitioner's crimes.

In a brief decision not mentioning the Standards, the hearing panel recommended one year's actual suspension, prospective to interim suspension. The panel found that petitioner's conduct was "wilful" and "fraudulent"; that the conduct did not arise out of the practice of law or cause injury to a client; and that petitioner presented "no substantial evidence of mitigating circumstances."

In a separate set of findings, the review department[7] emphasized that each of petitioner's crimes involved preparation of *knowingly* false documents. The department found one mitigating factor (petitioner's blemish-free disciplinary record) and one aggravating factor (multiple acts of "perjury"). The department also cited standard 3.2, which provides that crimes involving moral turpitude "shall result in disbarment" unless "the most compelling mitigating circumstances clearly predominate. . . ." The review department increased the recommended discipline to disbarment because "the record fails to show sufficient mitigation to justify deviation from disbarment as the standard prescribed for an attorney's final conviction of a crime of moral turpitude." This petition followed.

## DISCUSSION

■ There is no dispute that petitioner's crimes involve moral turpitude. (See *In re Bloom* (1987) 44 Cal.3d 128, 134 [241 Cal.Rptr. 726, 745 P.2d 61] [crimes based on "knowledge of the falsity of certain facts or documents, or of the illegality of certain conduct" involve moral turpitude].) Accordingly, our sole concern is whether to impose suspension or disbarment. (See Bus. & Prof. Code, §§ 6101, subd. (a), 6102, subd. (d); see also *In re Lamb* (1989) 49 Cal.3d 239, 245 [260 Cal.Rptr. 856, 776 P.2d 765].)

■ While we exercise our independent judgment in making this choice (*In re Ford* (1988) 44 Cal.3d 810, 815 [244 Cal.Rptr. 476, 749 P.2d 1331]), the review department's disciplinary recommendation is entitled to great weight. (*Warner* v. *State Bar* (1983) 34 Cal.3d 36, 43 [192 Cal.Rptr. 244, 664 P.2d 148].) As previously noted, the State Bar Court here relied upon standard 3.2. Although the Standards are not binding on this court, we generally will not reject a recommendation stemming from their application absent *"grave doubts"* as to its propriety. (*Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1366 [240 Cal.Rptr. 848, 743 P.2d 908], italics added.) The burden rests on petitioner to raise such doubts. (*Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962, 981 [239 Cal.Rptr. 675, 741 P.2d 172, 65 A.L.R.4th 1].) He has failed to do so here.

■ We first reject petitioner's attempt to minimize the seriousness of his crimes. Although only a single ballot campaign was involved, petitioner committed five separate acts of deceit solely to advance his career. Such dishonesty—particularly because it was aimed at ascending to the judiciary—raises serious questions concerning his professional trustworthiness and

---

[7]Seven referees voted for disbarment, and four dissented on grounds that such discipline was excessive.

judgment. (See *Levin* v. *State Bar* (1989) 47 Cal.3d 1140, 1147 [255 Cal.Rptr. 422, 767 P.2d 689]; *Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1100 [245 Cal.Rptr. 628, 751 P.2d 894]; *Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 679-680 [244 Cal.Rptr. 462, 749 P.2d 1317].) Petitioner's criminal conduct also inflicted substantial harm upon "the public [and] the administration of justice." (Std. 1.2(b)(iv).) Through use of these false documents, he exposed voters to an unqualified candidate and presumably drew votes away from candidates legitimately on the ballot. While the record does not reflect whether petitioner's candidacy actually affected the election's outcome, his conduct seriously undermines public confidence in the integrity of the legal profession and the election process.

Petitioner nonetheless insists that his misconduct is mitigated by evidence of his good character. He primarily relies upon a letter written *to this court* on March 27, 1984, by Judge LeRoy A. Simmons, who handled only the sentencing phase of the criminal proceedings. Judge Simmons explains that he is "not personally acquainted" with petitioner "other than by reputation," and that he is aware of the character testimony introduced on petitioner's behalf at trial. Judge Simmons opines that, given the reputation of "high moral integrity" that petitioner enjoys in the legal community, it would be a "tragic event" if petitioner were subjected to any discipline beyond mere "reprimand."

As we have explained on several recent occasions, this court generally hesitates to rely upon *any* documentary evidence that is extrinsic to the record of the proceedings before the State Bar. (See *In re Lamb, supra,* 49 Cal.3d at pp. 247-248; *Lydon* v. *State Bar* (1988) 45 Cal.3d 1181, 1187 [248 Cal.Rptr. 830, 756 P.2d 217]; *Coppock* v. *State Bar, supra,* 44 Cal.3d at pp. 682-683; *Rosenthal* v. *State Bar* (1987) 43 Cal.3d 658, 663 [238 Cal.Rptr. 394, 738 P.2d 740]; *In re Possino* (1984) 37 Cal.3d 163, 171 [207 Cal.Rptr. 543, 689 P.2d 115], fn. omitted.) Such documentation typically involves several levels of hearsay statements and opinions, and offers no means by which to evaluate the qualifications, credibility, or personal knowledge of the various declarants. Here, for example, the 1984 letter reflects an "out-of-court" assessment of petitioner's character based exclusively upon the collective beliefs of persons who did not testify before the State Bar.

Even if full consideration is given to the 1984 letter, evidence of petitioner's "good character" is not "extraordinary." (Std. 1.2(e)(vi).) Most of this evidence (trial testimony and the 1984 letter) consists of brief, cumulative descriptions of petitioner's general *reputation* in late 1983 and early 1984. Neither the trial witnesses nor Judge Simmons described specific events or personality traits known about petitioner before he was criminally

convicted. Moreover, at the disciplinary hearing in early 1987, only *one* attorney testified that petitioner was presently fit to practice law. However, this opinion was based exclusively upon professional contact with petitioner *before* he was convicted, and upon his *reputation* afterwards. This witness provided no detailed personal information about petitioner at any point during their relationship. And, the record does not reflect any significant contact between the two men during the *three years* between the sentencing and disciplinary hearings.

In short, the review department correctly found no "compelling" mitigating evidence within the meaning of standard 3.2. Petitioner's expressions of "remorse" to the State Bar have little mitigating weight in light of his apparent refusal to acknowledge any wrongdoing. (Cf. std. 1.2(e)(vii) [remorse and recognition of wrongdoing is a mitigating factor].) Such refusal is inexplicable here. Consistent with earlier affirmance of his convictions on appeal, petitioner admitted at the disciplinary hearing that he never actually lived at the Mt. Vernon address. He also gave inherently unbelievable hearing testimony about the Valle Vista address. (See, e.g., *Carter* v. *State Bar, supra,* 44 Cal.3d at p. 1101 [attorney's "defense did not rest on a good faith belief that the charges were unfounded, but on a blanket refusal to acknowledge the wrongfulness of conceded conduct"]; cf. *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 743-745 [159 Cal.Rptr. 848, 602 P.2d 768].)

As noted by the review department, petitioner's lack of prior discipline in the 10 years preceding the instant misconduct weighs in his favor. (See std. 1.2(e)(i).) However, a "clean" record and "good" reputation do not warrant rejection of a disbarment recommendation where, as here, a significant risk to the public and profession remains. Petitioner has violated a basic rule of ethics—honesty—under obvious, serious, and essentially unmitigated circumstances. We therefore adopt the State Bar Court's recommendation that petitioner be disbarred.[8]

It is ordered that petitioner Alfredo G. Rivas be disbarred and that his name be stricken from the roll of attorneys in this state. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

---

[8] It appears, however, that petitioner will soon be eligible to apply for reinstatement. Rule 662 of the Rules of Procedure of the State Bar states that "[n]o [reinstatement] petition shall be filed within five years after the effective date of *interim suspension* or disbarment or resignation whichever *first* occurred . . . ." (Italics added.) Since petitioner's "interim suspension" was "effective" January 11, 1985, the five-year period presumably expires January 11, 1990. We express no view on petitioner's ultimate chance of success. (See *Calaway* v. *State Bar* (1986) 41 Cal.3d 743, 745-746 [225 Cal.Rptr. 267, 716 P.2d 371].)

**MOSK, J.**—I dissent. From the earliest days of California jurisprudence, the place of an individual's residence has been a matter of intent. As stated in *Estate of Brady* (1918) 177 Cal. 537, 539 [171 P. 303], "the place of his residence depend[s] upon his intention as manifested by his acts and declarations on the subject." To the same general effect is *Chambers v. Hathaway* (1921) 187 Cal. 104, 105 [200 P. 931]: "legal residence is almost altogether a question of his intent."

However, it is also clear that in determining residence "the courts look to a person's actions as well as to his statement of intent" (*Balff v. Public Welfare Department* (1957) 151 Cal.App.2d 784, 788 [312 P.2d 360]). Here, the criminal court looked beyond petitioner's intent to his actions and found him guilty of felonious conduct. He was placed on probation and the convictions were subsequently reduced to misdemeanors.

I recognize that we cannot go behind that conviction. I cite the settled law on residence intent merely to suggest that petitioner's conduct, though found to be improper in connection with a political campaign, was not as egregious as the majority claim.

The hearing panel of the State Bar saw and heard the witnesses, and recommended suspension from the practice of law for one year. By a vote of seven to four, the review department increased the proposed discipline to disbarment. This wide disparity in the discipline recommended by the two bar agencies makes it all the more important for us to exercise wisely our independent judgment as to the appropriate discipline.

In my view, disbarment under these circumstances is punitive and excessive for a petitioner who has no prior record of misconduct. I would adopt the recommendation of the hearing panel and suspend petitioner for one year, to be followed by a period of several years on supervised probation.